IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 17, 2019 Session

**STATE OF TENNESSEE v. ROBERT JASON ALLISON**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2264    Mark J. Fishburn, Judge**
_____

**No. M2017-02367-CCA-R3-CD**
_____

Defendant, Robert Jason Allison, was indicted for two counts of delivery of marijuana; possession with intent to distribute over ten pounds of marijuana in a drug-free school zone; possession of a firearm during the commission of a dangerous felony; and two counts of money laundering. Following a jury trial, at which Defendant represented himself, he was convicted as charged. Following a sentencing hearing, the trial court imposed partial consecutive sentencing resulting in an effective 25-year sentence. In this appeal as of right, Defendant contends that: 1) the evidence was insufficient to support his convictions for money laundering; 2) the indictment conflated two subsections of the money laundering statute; 3) the trial court failed to instruct the jury on all of the elements of money laundering; 4) Defendant's convictions for money laundering violate double jeopardy; 5) the money laundering statute is unconstitutionally vague; 6) Defendant was deprived his right to a speedy trial; 7) the trial court erred by denying Defendant's motion to suppress evidence seized as a result of his warrantless arrest; 8) the trial court erred by denying Defendant's motion to suppress evidence seized as a result of a search warrant; 9) the trial court erred in finding that Defendant waived his right to the assistance of counsel at trial; 10) the trial court abused its discretion in ordering consecutive sentencing; and 11) Defendant's fines are excessive. Having reviewed the entire record and the briefs of the parties, we find no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Richard C. Strong, Nashville, Tennessee (on appeal) and Robert Jason Allison, *Pro Se*, (at trial).

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Andrea Green, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Pretrial motions

#### Motions to suppress

Prior to trial, Defendant filed *pro se* motions to suppress his statement to police and evidence seized during the search of a home associated with one of the drug buys. Defendant argued that the search warrant was not supported by probable cause because the confidential informant was not credible and because Defendant's sister, not Defendant, was the owner of the property to be searched. In one of his *pro se* motions to suppress, Defendant asserted that his statement to police should be suppressed because he requested an attorney "at le[a]st (5) five times" during the interview. In his motion for new trial, however, Defendant argued that his statement should have been suppressed because it was made following a warrantless arrest.

At a hearing on Defendant's motions, Detective Scott Cothran testified that a confidential informant bought marijuana from Defendant on two separate occasions. On both occasions, Defendant also fronted additional marijuana to the informant with the expectation that the informant would pay Defendant after the fronted marijuana was sold. The informant later paid Defendant for the fronted marijuana using money provided by the police. The transactions involving Defendant occurred either at a home on Elkins Avenue or a home on James Avenue. The transactions were monitored and recorded. Detective Cothran testified that Defendant lived at the home on Elkins Avenue and that Defendant's girlfriend lived at the home on James Avenue.

Detective Cothran obtained a search warrant for the home on Elkins Avenue. He testified that surveillance teams watched the home for an hour before the warrant was executed. Defendant was standing "at the back of the property" behind the house. Detective Cothran did not see Defendant arrive, but as soon as police saw Defendant behind the house, Defendant was placed under arrest. During a search of Defendant's person, police found "around $2,400" that was used to purchase marijuana in the controlled buys. During a search of the residence, police found approximately 47 pounds of marijuana in a Rubbermaid tub in the garage. They found "several pistols, one of which was stolen" in a bedroom in the home. Defendant gave a statement to police. The interview, which was recorded, occurred in the garage, and Defendant was handcuffed during the interview. Detective Cothran testified that Defendant was "absolutely"

forthcoming in the interview. Defendant admitted that he knew what was inside the Rubbermaid tub. Defendant told the police that the guns belonged to his sister, and he kept them in his closet because he had heard threats that he might be robbed.

On cross-examination, Detective Cothran acknowledged that he did not have a warrant for Defendant's arrest. He also acknowledged that Defendant was near the trash cans in an alley behind the house, and Detective Cothran could not say whether Defendant "had a foot" on the property. Detective Cothran advised Defendant of his *Miranda* rights outside by the trash cans when he was handcuffed. Detective Cothran was present when the search warrant was signed, but the judge waited to give it to another officer, Andrae Starling, who was at the Elkins Avenue residence during the execution of the search warrant.

Lisa Smithson, Defendant's sister, testified that she inherited the Elkins Avenue property from her mother. She wrote a check to pay the property taxes on it about a week after the search. She testified that the guns found inside the home belonged to her. On cross-examination, Ms. Smithson testified that she did not know why Metro tax assessor records, dated about two months before the search, listed Defendant as one of the property owners.

*Motion for speedy trial*

No proof was presented at the hearing on Defendant's motion to dismiss based on a violation of his right to a speedy trial. Defense counsel argued, "I don't know what the problem has been with [Defendant] and the other attorneys. He has been nothing but a gentleman with [co-counsel] and myself, maybe it's in part he just needed someone who would be willing to listen to him and would be willing to file motions that have merit in the case."

*Trial court's order*

In a written order denying both of Defendant's motions, the trial court found the testimony of Detective Cothran to be credible. The court found that Defendant "was within sufficient boundary of the residence to include him as an individual on the premises subject to arrest by virtue of the search warrant." The trial court also found that there was sufficient independent corroboration of the informant's information to justify the issuance of a search warrant. Regarding Defendant's speedy trial violation motion, the trial court noted that Defendant had "demanded continuances and new counsel on at least eight occasions." The court found that the "entirety of the delay in this matter has been caused by the Defendant himself." The court also found that Defendant was not prejudiced by the delay.

*Trial*

Detective Scott Cothran testified that police used an informant to make two controlled purchases of marijuana from Defendant. The first purchase occurred on January 9, 2009. It was supposed to happen at the home on Elkins Avenue, but Defendant became suspicious and the location was changed to the home on James Avenue. The informant was given $5,000 to purchase five pounds of marijuana from Defendant. Defendant "fronted" the informant three additional pounds, which the informant was expected to sell and return the money from the sale to Defendant. Detective Cothran arranged to have the informant pay $3,000 to Defendant for the "fronted" drugs on January 13, 2009, at the Elkins Avenue home, which was across the street from a school.

Detective Cothran testified that Detective Steve Parks arranged the second controlled buy, which occurred on January 16, 2009, at the Elkins Avenue address. The informant purchased six pounds of marijuana, and Defendant "fronted" her an additional four pounds. Payment was made to Defendant for the "fronted" amount at the James Avenue address on January 20, 2009.

Detective Cothran testified that during one of the controlled buys, Defendant told the informant that he expected "another load [to be] coming in." Police obtained search warrants for the Elkins Avenue and James Avenue addresses. The search warrants were executed on January 21, 2009. A surveillance team at the Elkins Avenue address reported seeing Defendant arrive in a truck and carry a green tub into a detached garage at the back of the property. The search warrant was executed, and Detective Cothran and another officer took Defendant into custody. During a search incident to arrest, they discovered $2,460 of the controlled buy money on Defendant.

Detective Cothran testified that the Elkins Avenue home had belonged to Defendant's mother, who had passed away. Inside one of the bedrooms, police found two pistols. The plastic tub inside the garage contained approximately 46 pounds of marijuana. Defendant waived his *Miranda* rights and gave a recorded statement to police. He told police that the guns belonged to his sister, and he had them in his closet because he had recently been threatened. Detectives asked Defendant what he did for a living, and Defendant said, "I ain't got nothing [sic] going on right now."

Special Agent Glen Glenn, of the Tennessee Bureau of Investigation (TBI) Crime Lab, testified regarding the chain of custody requirements when evidence was submitted for testing. Agent Glenn testified that the State's exhibits were delivered to his lab on May 14, 2009. He issued his reports on July 13, 2009. The initial report erroneously

stated the amount in grams instead of pounds, and it was amended in 2013 to correct the error. Agent Glenn testified that the green tub contained ten "bricks" of marijuana, weighing 44.6 pounds total. A separate bag inside the tub contained 0.8 pounds of marijuana. Agent Glenn also examined the contents of ten bags, containing 9.5 total pounds of marijuana that was purchased by the informant from Defendant in the second controlled buy on January 16, 2009. Agent Brett Trotter, of the TBI, testified that he examined the marijuana that was purchased by the Defendant in the first controlled buy on January 9, 2009, and he determined that it weighed slightly less than eight pounds.

Steven Keel, director of security for Metro Nashville Public Schools, testified that Park Avenue Elementary School was located at 3703 Park Avenue. David Kline, of the Metro Planning Department, prepared a map using information from the tax assessor's office that showed that the Elkins Avenue home was within 1,000 feet of the school.

Lisa Smithson, Defendant's sister, testified it was not her signature on an affidavit of heirship filed with the tax assessor's office. She testified that she lived at the Elkins Avenue address where the search warrant was executed. She testified that Defendant had his own house and that he did not stay at her house. Ms. Smithson testified that she was home on January 21, 2009, when "at least probably 20" police vehicles surrounded her house. She testified that police exited their vehicles with guns drawn. She testified that Defendant arrived with roofing materials for her home. She testified that there were people working on her roof, and they had been going in and out of the garage. Ms. Smithson saw Defendant get arrested in the alley behind her house. She testified that Defendant was "actually more towards the house across the street." Ms. Smithson testified that officers used "a lot of force" and that they broke the ribs of another person, Joe Keyes. An audio recording that Ms. Smithson made during a visit to the tax assessor's office, in which an employee stated that Defendant's name was not listed as an owner of the Elkins Avenue home, was admitted into evidence.

Heather Johnson testified that she was at Ms. Smithson's house on the day of Defendant's arrest. She testified that the arrest occurred in the alley behind Ms. Smithson's home. She testified that officers had their guns drawn.

Defendant did not testify or present any other evidence.

*Sentencing hearing*

At the sentencing hearing, the presentence report was admitted into evidence. Detective Cothran testified that he interviewed Defendant following Defendant's arrest. Detective Cothran asked Defendant how he was employed, and Defendant answered, "I

don't have anything going on right now." Police seized over $2,000 in cash from Defendant's person.

Phillip Taylor, a drug task force investigator, testified that Defendant had been under investigation since 2002. Between 2002 and 2005, Defendant was associated with 17 different vehicles. In October, 2002, an informant made a controlled buy of a quarter of a kilo of cocaine for $7,000 from Defendant and another man, Trey Hines. On another occasion, in 2005, an informant purchased two pounds of marijuana from Defendant. During that transaction, Defendant gave the informant "samples" to give away "to get customers interested in buying marijuana."

Defendant did not testify or present any proof at the sentencing hearing.

At the conclusion of the sentencing hearing, the trial court noted that the jury imposed fines of $2,500 for each of Defendant's two convictions for delivery of marijuana; $90,000 for Defendant's conviction for possession with intent to distribute over ten pounds of marijuana in a school zone; and $15,000 for each of Defendant's two money laundering convictions. The trial court stated on the record that it had considered the evidence presented at trial and at the sentencing hearing, the presentence report, the principles and purposes of the Sentencing Act, the arguments of both parties, the nature and characteristics of the criminal conduct involved, the evidence offered as to enhancement and mitigating factors, Defendant's statements, and his potential for rehabilitation. The trial court determined that Defendant's prior convictions made him a Range III offender in counts one through four and a Range II offender for the two Class B felony money laundering convictions.

The trial court found that Defendant had prior convictions in addition to those necessary to establish his range and that Defendant was a leader in the commission of the offenses. *See* T.C.A. § 40-35-114(1) and (2). In mitigation, the trial court found that Defendant's crimes neither caused nor threatened serious bodily injury. *See* T.C.A. § 40-35-113(1). The trial court noted that Defendant refused to provide information for the presentence report. The trial court also noted that "since 2002, [Defendant's] primary activity seems to have been related to drug sales in one form or another." The trial court found that Defendant was a professional criminal who has knowingly devoted much of his adult life to criminal acts as a major source of livelihood, that his record of criminal activity is extensive, and that Defendant showed a clear disregard for the laws and morals of society and a low probability of being rehabilitated.

The trial court imposed sentences of five years for each of Defendant's delivery of marijuana convictions; ten years for his conviction for possession with intent to distribute over ten pounds of marijuana in a school zone; three years for his firearm conviction; and

15 years for each of his money laundering convictions. The court ordered partial consecutive sentencing, resulting in an aggregate sentence of 25 years in confinement.

## *Analysis*

Defendant contends that the evidence at trial was insufficient to support his convictions for money laundering. Defendant also contends that the indictment conflated two subsections of the money laundering statute, Tennessee Code Annotated section 39-14-903, and he contends that the trial court's instructions to the jury did not include an essential element of the offense of money laundering. We will address each issue separately.

## *Indictment*

Defendant challenges the indictment, arguing that the indictment "appears to conflate two separate subsections [subsections (b) and (c)] under Tenn. Code Ann. § 39-14-903." The State argues that this issue is waived for review. We agree. Defendant failed to raise this issue prior to trial or in his motion for new trial or amended motion for new trial. Accordingly, the issue is waived. *See Wyatt v. State*, 24 S.W.3d 319, 322 (Tenn. 2000) (holding that unless an indictment is so defective as to fail to vest jurisdiction, challenges to an indictment must be raised prior to trial, citing Tenn. R. Crim. P. 12(b)(2)(B)).

## *Jury charge*

Defendant contends that the trial court omitted an element of the offense in its instruction to the jury. Defendant argues that the trial court's instruction to the jury omitted the "conceal or disguise" element of subsection (c) of the money laundering statute. The State responds that Defendant was not charged with concealing the proceeds, but rather he was charged with using the proceeds in furtherance of carrying on illegal activity. See T.C.A. § 39-14-902(c).

The trial court charged the jury as follows:

> For you to find [Defendant] guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following elements: (1) knowingly conduct a financial transaction or make any other disposition of property or proceeds with the intent to promote the carrying on of the sale of a Schedule VI controlled substance, to-wit: Marijuana; and (2) that it was represented to the defendant by another person at the direction of a law enforcement officer to be the property or

proceeds derived from the sale of a Schedule VI controlled substance, to-wit: Marijuana, or other criminal activity.

Subsection (c) of the money laundering statute makes it an offense to "knowingly conduct . . . a financial transaction . . . involving property or proceeds represented by a law enforcement officer, . . . , to be the proceeds derived from a specified unlawful activity with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds *or* with the intent to promote the carrying on of a specified unlawful activity." T.C.A. § 39-14-902(c) (emphasis added). Defendant was not charged with concealing or disguising the criminally derived proceeds, but rather, he was charged with using the proceeds in furtherance of carrying on illegal activity. Therefore, the trial court's omission of "conceal or disguise" in its charge to the jury was not error. Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

Defendant asserts that the evidence was insufficient to support his convictions for money laundering. Specifically, Defendant argues that the evidence did not establish "separate transactions" in the act of taking payment for the fronted drugs. Defendant argues that the informant's act of returning to pay Defendant for the amount of "fronted" marijuana was not a distinct transaction, but rather "the conclusion of the single transaction for the sale of marijuana." Defendant argues, "[t]his constitutes the dirtying of money, not the laundering of money."

Defendant raises a unit-of-prosecution claim, contending that the payments made for the fronted drugs were merely part and parcel of the original drug transactions, rather than separate acts. Unit-of-prosecution claims arise when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the "same offense." When addressing unit-of-prosecution claims, courts must determine "what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012); *State v. Anthony T. Brandon*, No. M2015-00654-CCA-R3-CD, 2016 WL 1600279, at *7 (Tenn. Crim. App. Apr. 19, 2016), *no perm. app. filed*. In determining the unit of prosecution, we must first examine the statute in question to determine if the statutory unit of prosecution has been expressly identified. *State v. Smith*, 436 S.W.3d 751, 768 (Tenn. 2014). If there is ambiguity or uncertainty in defining the unit of prosecution, courts apply the "rule of lenity," meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution. *Watkins*, 362 S.W.3d at 543-44. "The legislature has the power to create multiple 'units of prosecution' within a single statutory offense, but it must do so clearly and without ambiguity." *State v. Lewis*, 958

S.W.2d 736, 739 (Tenn. 1997). "As for criminal offenses in Tennessee, statutes are to be construed 'according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code.'" *Id*. (citing T.C.A. § 39-11-104).

Tennessee Code Annotated section 39-14-903 makes it an offense "to knowingly conduct . . . a financial transaction or make other disposition involving property or proceeds represented by . . . another at the direction of a law enforcement officer, to be the property or proceeds derived from a specified unlawful activity with the intent to . . . promote the carrying on of a specified unlawful activity." T.C.A. § 39-14-903(c)(1). In the context of drug transactions, this court has noted that Tennessee Code Annotated section 39-17-417 does not define the term "sale." *See State v. Clifford Leon Farra*, No. E2001-02235-CCA-R3-CD, 2003 WL 22908104, at *6 (Tenn. Crim. App. Dec. 10, 2003), *perm. app. denied* (Tenn. May 10, 2004). This court has adopted the definition of "sale" in Black's Law Dictionary 1200 (5th ed. 1979), as "a contract between two parties by which the seller, in consideration of the payment or promise of payment of a certain price in money, transfers to the buyer the title and possession of the property." *Id*.

Defendant was indicted in count five for accepting payment of $3,000 from the informant on January 13, 2009, for three pounds of marijuana "fronted" on January 9, 2009. Defendant was indicted in count six for accepting payment from the informant on January 20, 2009, for four pounds of marijuana fronted on January 16, 2009. The State argues, and we agree, that the act of accepting payment for the fronted drugs constituted a "financial transaction" separate and distinct from the original transactions on January 9th and 16th, in which Defendant and the informant arranged to exchange a particular amount of marijuana for a specific price. In its closing argument, the State made clear that the money laundering charges related solely to the money paid to Defendant as payment for the fronted drugs. Detective Cothran testified that during one of the transactions, "there was some discussion about another load coming in."

From this proof, a reasonable jury could infer that Defendant was in the business of selling marijuana and that he intended to use the money paid to him for the fronted drugs to buy more drugs to deliver or sell. This is the conduct that the money laundering statute intends to proscribe. We conclude that the evidence is sufficient to support Defendant's money laundering convictions. Defendant is not entitled to relief on this issue.

*Double jeopardy*

In a related issue, Defendant contends that his convictions for the sale of marijuana and money laundering violate double jeopardy because they occurred from the

same transaction. The State argues that Defendant engaged in four separate transactions. On two occasions, the informant contracted with Defendant to purchase particular amounts of marijuana, five and six pounds respectively. On both occasions, after concluding the initial transaction, the informant and Defendant entered into new agreements in which Defendant agreed to front the informant more marijuana, for which the informant would pay Defendant later.

Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness. *See State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009). The Double Jeopardy Clause has been interpreted as providing three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *abrogated on other grounds by Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989). This appeal involves the third category of protection afforded by the Double Jeopardy Clause – protection against multiple punishments for the same offense imposed in a single prosecution.

In determining whether two statutes define the same offense, the United States Supreme Court long ago declared that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. U.S.*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932); *see also Rutledge v. U.S.*, 517 U.S. 292, 297, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (stating that the Court has applied *Blockburger* for over a half century to determine whether a defendant has been punished twice for the "same offense"). The *Blockburger* test requires an examination of the statutory elements in the abstract, without regard to the proof offered at trial in support of the offenses. *See U.S. v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) ("The same-elements test, sometimes referred to as the '*Blockburger*' test, inquires whether each offense contains an element not contained in the other . . . ."). If each offense includes an element that the other offense does not, "the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli v. U.S.*, 420 U.S. 770, 785 n. 17, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975).

In a *Blockburger* analysis, our primary focus is whether the General Assembly expressed an intent to permit or preclude multiple punishments. *State v. Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012). When the General Assembly has expressed an intent to permit multiple punishments, no further analysis is necessary, and multiple convictions should be upheld against a double jeopardy challenge. *Id*. Likewise, if the General

- 10 -

Assembly has expressed an intent to preclude multiple punishment, then no further analysis is necessary, and improper multiple convictions should be vacated. *Id*. When the legislative intent is unclear, however, we must apply the "same elements test" from *Blockburger*. *Id*. at 546-47. Under this test, the first step is to determine whether the convictions arise from the same act or transaction. *Id*. at 545. The second step is to determine whether the elements of the offenses are the same. *Id*. at 557. If each offense contains an element that the other offense does not, the statutes do not violate double jeopardy. *Id*.

Here, the money laundering statute specifically provides that, "[a] defendant charged with a violation of one (1) or more offenses within § 39-14-903 may also be jointly charged, tried and convicted in a single prosecution for committing any related specified unlawful activity, which shall be separately punished." T.C.A. § 39-14-904. We conclude that the legislature intended to permit multiple punishments. Defendant is not entitled to relief on this issue.

*Money laundering statute*

Defendant contends that Tennessee Code Annotated section 39-14-903, which prohibits engaging in a financial transaction to promote the "carrying on" of a specified illegal activity, is void for vagueness. Specifically, Defendant argues that the phrase "carrying on" "fails to alert someone as to what constitutes a prohibited action under the statute." The State asserts that Defendant has waived consideration of this issue by failing to raise it in a pretrial motion. We note that the issue was raised in Defendant's motion for new trial.

In any event, we conclude that the statute is not unconstitutionally vague. Because Defendant has challenged the constitutionality of a statute, the general principles of statutory construction apply. Appellate courts are charged with upholding the constitutionality of statutes wherever possible. *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn. 1990). In other words, we are required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute when reviewing a statute for a possible constitutional infirmity. *Lyons*, 802 S.W.2d at 592.

The language of a penal statute must be clear and concise to give adequate warning so that individuals might avoid the prohibited conduct. *State v. Boyd*, 925 S.W.2d 237, 242-43 (Tenn. Crim. App. 1995). A statute is void for vagueness if it is not "sufficiently precise to put an individual on notice of prohibited activities." *State v. Thomas*, 635 S.W.2d 114, 116 (Tenn. 1982); *see also State v. Wilkins*, 655 S.W.2d 914, 915 (Tenn. 1983). A criminal statute "shall be construed according to the fair import of [its] terms" when determining if it is vague. T.C.A. § 39-11-104. "Due process requires

that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have reasonably understood to be proscribed." *State v. Burkhart*, 58 S.W.3d 694, 697 (Tenn. 2001) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)).

This court has previously held that the money laundering statute is sufficiently precise to put an individual on notice of prohibited activities. *State v. Joseph Chi-Choi Wong*, No. M2003-00504-CCA-R3-CD, 2004 WL 1434384, at *13 (Tenn. Crim. App. June 25, 2004), *perm. app. denied* (Tenn. Dec. 6, 2004). In that case, the defendant challenged the statute as vague because, the defendant argued, "by its nature it applies to every felony under state law" and "makes the use of money under any context of a knowing violation of any felony a separate and distinct offense" which "makes it impossible for a person to know what is or what is not a crime with respect to money laundering." *Id*. A panel of this court held that the statute is "not void for vagueness because it applies to the proceeds of *any* unlawful activity." *Id*. (emphasis in original).

We determine that the phrase "carrying on" is not susceptible to different interpretations regarding that which the statute actually proscribes. *See State v. Whitehead*, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000). In its order denying Defendant's motion for new trial, the trial court concluded that "'carrying on' clearly means the continuation or furtherance of an unlawful activity." We agree. In his brief on appeal, Defendant offers no alternative interpretation to the term "carrying on." Defendant is not entitled to relief on this issue.

*Speedy trial*

Defendant contends that the trial court erred by denying his motion to dismiss the charges against him based on a violation of his right to a speedy trial. The State responds that the trial court properly denied Defendant's motion.

"The right to a speedy trial arises under the Sixth Amendment to the Constitution of the United States made applicable to the State by the Fourteenth Amendment . . . and Article 1, § 9 of the Constitution of Tennessee . . . ." *State v. Bishop*, 493 S.W.2d 81, 83 (Tenn. 1973). To determine whether a defendant's constitutional right to a speedy trial has been violated this court must conduct the balancing test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). *See State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996); *State v. Baker*, 614 S.W.2d 352, 353 (Tenn. 1981). Under the *Barker* analysis, the following four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. 407 U.S. at 530.

- 12 -

The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial. *State v. Vickers*, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997). In this case, Defendant was indicted on August 26, 2010, and the trial began on April 13, 2015, resulting in a delay of over four and a half years. A delay of one year or longer will usually trigger an inquiry into a speedy trial violation. *Id*.

The second factor, the reason for delay, generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. *Wood*, 924 S.W.2d at 346-47. A review of the record shows that the delay in this case falls squarely into the fourth category.

The record shows that on July 19, 2012, the trial court granted a motion to withdraw filed by Defendant's counsel as of that date. On August 24, 2012, new counsel was appointed. Defendant's new counsel filed a motion to dismiss the charges based on a violation of Defendant's right to a speedy trial. In the motion, new defense counsel acknowledged that Defendant had already been represented by five attorneys. The trial court denied the motion to dismiss on October 26, 2012. On December 12, 2012, new counsel filed a motion to be relieved. On February 8, 2013, the trial court granted the motion and allowed Defendant to represent himself. On March 22, 2013, the trial court held a hearing and appointed another attorney to represent Defendant. On April 12, 2013, newly appointed counsel filed a motion to withdraw as counsel, stating that Defendant had "informed counsel of his intent to represent himself at trial and waive his right of counsel." Counsel also filed on behalf of Defendant a motion to waive counsel and allow Defendant to represent himself. The trial court's minutes reflect that Defendant was allowed to proceed *pro se*.

On July 17, 2013, Defendant filed a *pro se* motion for speedy trial. Defendant contended that none of his previous attorneys would honor his request to file a motion for speedy trial. Defendant's trial was set to begin on September 23, 2013, and Defendant requested that the trial be continued and he be appointed new counsel. Defendant was once again appointed new counsel, and this attorney filed a motion to withdraw on January 30, 2014. The trial court granted the motion, and counsel was relieved on February 7, 2014. On March 12, 2014, Defendant filed a *pro se* motion to dismiss based on a violation of his right to a speedy trial. The trial court denied Defendant's motion on March 14, 2014. On July 28, 2014, Defendant requested that counsel be appointed to represent him, and the court appointed new counsel. New counsel filed several motions, including a motion to dismiss, a motion for speedy trial, motions to suppress evidence seized during the execution of two search warrants, and a motion to suppress Defendant's

statement to police. The State filed responses to Defendant's motions. Following a hearing, the trial court denied Defendant's motions by written order on November 19, 2014.

Defendant's latest attorney also subsequently filed a motion to withdraw and also moved to recuse the trial judge. The trial court granted counsel's motion to withdraw and ordered Defendant "to hire his own attorney." Also, the trial court granted Defendant's motion to recuse itself. On February 4, 2015, a new trial judge was assigned, and on February 25, 2015, another attorney was appointed to represent Defendant. Thereafter, Defendant sought an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, from the trial court's denial of his motion to dismiss the indictment due to a violation of Defendant's right to a speedy trial. Defendant's application for permission to appeal was denied based on an insufficient record because Defendant did not include with his application the motion to dismiss, any response from the State, or a transcript of the hearing on the motion.

Defendant's trial was set for April 14, 2015. On that day, Defendant filed a pro se motion to recuse the second trial judge. Defendant also filed a motion to quash, contending that the grand jury returned indictments based upon perjured testimony. The trial court denied both motions, and Defendant proceeded to trial.

In denying Defendant's last motion to dismiss based on a violation of his right to a speedy trial, the trial court made the following findings and conclusions:

> The Defendant has been incarcerated for over four years after having his bond revoked when he picked up new charges in this case.
>
> . . . .
>
> On October 26, 2012, this Court denied a previously filed speedy trial motion filed by the Defendant based on his obstinance as illustrated by the numerous attorneys he has fired throughout the proceedings. As the State points out, the Defendant has demanded continuances and new counsel on at least eight occasions. He also insisted on proceeding pro se at trial, however, on the morning of trial, the Defendant thought better of such strategy and again requested appointment of new counsel. Considering these facts, the Court finds that the entirety of the delay in this matter has been caused by the Defendant himself.

Regarding the third factor, the record shows that Defendant asserted his right to a speedy trial in two separate motions. Finally, we must determine whether Defendant was

prejudiced by the delay, which is the "final and most important factor in the [speedy trial] analysis." *State v. Simmons*, 54 S.W.3d 755, 760 (Tenn. 2001). Prejudice is to be assessed in light of the following interests of the accused which the right to a speedy trial was designed to protect: (1) to prevent undue and oppressive incarceration prior to trial; (2) to minimize the anxiety and concern that results from being accused of a crime; and (3) to limit the risk that the defense will be impaired. *Id*. Our supreme court has stated that "the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense." *State v. Berry*, 141 S.W.3d 549, 568 (Tenn. 2004) (citing *State v. Baker*, 614 S.W.2d 352, 356 (Tenn. 1981)). Defendant makes no claims regarding how the delay impaired his defense, asserting only that "prejudice in this matter is apparent because [Defendant] was subjected to over five years of pre-trial incarceration." Under the circumstances, we conclude that his incarceration prior to trial was not so excessively oppressive as to outweigh the other factors. As we explained, the delays in trial were the result of numerous requests by Defendant to be appointed new counsel. In balancing the factors, we conclude that Defendant's right to a speedy trial was not violated. Accordingly, Defendant is not entitled to relief on this issue.

*Motions to suppress*

Defendant contends that the trial court erred by denying his motion to suppress his statements to police following his arrest, as well as to suppress the evidence found in the search of the Elkins Avenue home.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

There are three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter that requires no objective

- 15 -

justification." *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted). The parties do not dispute that a full-scale arrest is at issue in this case.

Defendant contends that the trial court should have suppressed any statements he made as a result of his warrantless arrest. Defendant argues that he was illegally arrested because there was no proof that he was on the property of the Elkins Avenue home at the time the search warrant was executed. In denying Defendant's motion to suppress, the trial court made findings of fact that Defendant was on the property to be searched and therefore subject to arrest. The State argues that police had probable cause to arrest Defendant regardless of his presence on or off the property.

Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *State v. Bridges*, 963 S.W.2d 487 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Officers were aware of Defendants' two controlled drug buys. Defendant was named in the search warrant. Detective Cothran listened to an audio recording of one of the controlled buys, in which Defendant told the informant that he was expecting a shipment of marijuana to arrive at the Elkins Avenue home. We conclude that Defendant's arrest was supported by probable cause.

Defendant also argues that the statements of the informant failed to support probable cause for the issuance of the search warrant because there was no showing of the reliability of the informant. In denying Defendant's motion to suppress, the trial court ruled:

> Extensive surveillance was conducted in this matter, which led detectives to seek a search warrant. Four controlled drug transactions were conducted by detectives using the confidential informant. On each occasion, the informant was searched and fitted with a hidden audio transmitter which was monitored by the detectives, who also maintained surveillance and retrieved the contraband given to the informant by the Defendant.

At the time of the suppression hearing in the present case, a supporting affidavit that included information supplied by an unknown informant or a criminal informant was required to show (1) the informant's basis of knowledge; and (2) the veracity of the informant or the reliability of the informant's information. *See State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989) (citing *Spinelli v. U.S.*, 393 U.S. 410, 415-16 (1969);

- 16 -

*Aguilar v. Texas*, 378 U.S. 108, 114 (1964)). The Tennessee Supreme Court has since adopted the totality-of-the-circumstances test, which requires the issuing magistrate to "'make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Tuttle*, 515 S.W.3d 282, 303-04 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (internal quotations omitted). Under the totality-of-the-circumstances analysis, the informant's basis of knowledge and veracity or credibility are no longer separate and independent considerations but are "'closely intertwined issues that may usefully illuminate the commonsense, practical question [of] whether there is probable cause to believe that contraband or evidence is located in a particular place.'" *Id*. at 308 (quoting *Gates*, 462 U.S. at 230) (internal quotations omitted). Barebones affidavits including only conclusory statements remain insufficient, and independent police corroboration of the information provided by the informant continues to add value to the affidavit. *Id*. at 307-08.

In the present case, the affidavit states that the informant placed phone calls to Defendant in the presence of officers and arranged to meet with Defendant to purchase marijuana. Officers observed Defendant arrive at the location the informant and Defendant had arranged to meet. Officers listened to the controlled drug buys via electronic surveillance. Following the controlled drug buys, officers took possession of several pounds of marijuana. Considering the totality of the circumstances, we conclude that the information in the affidavit is sufficient to establish probable cause for issuance of the search warrants. Accordingly, the trial court was correct in denying the Defendant's motion to suppress. Defendant is not entitled to relief on this issue.

*Right to assistance of counsel*

Defendant contends that the trial court erred by finding that Defendant implicitly waived his right to the assistance of counsel at trial and at sentencing. The State responds that Defendant expressly waived his right to counsel.

The standard of review for a defendant's exercise of the right of self-representation and the concurrent waiver of the right to counsel is a mixed question of law and fact. *State v. Hester*, 324 S.W.3d 1, 29 (Tenn. 2010). Our review is de novo with a presumption of correctness as to the trial court's factual findings. *Id*. at 29-30. "An error in denying the exercise of the right to self-representation is a structural constitutional error not amenable to harmless error review and requires automatic reversal when it occurs." *Id*. (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)).

- 17 -

It has long been established that a criminal defendant has a constitutional right to proceed without counsel "when he voluntarily and intelligently elects to do so." *Faretta v. California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *see also State v. Small*, 988 S.W.2d 671, 673 (Tenn. 1999). There are three essential prerequisites that must be present before the right of self-representation becomes absolute: (1) the right must be asserted in a timely manner; (2) the request must be clear and unequivocal; and (3) the defendant must knowingly and intelligently waive the right to counsel. *Id*. at 30-31. A defendant need not have knowledge of the law and the legal system equivalent to that of an attorney to knowingly and intelligently waive his right to counsel. *State v. Goodwin*, 909 S.W.2d 35, 40 (Tenn. Crim. App. 1995) (citing *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525). The record need only show that the defendant made his decision knowing the disadvantages and the dangers of self-representation. *Id*.

"The accused's lack of expertise or professional capabilities is not a factor to be considered by the trial court when an accused invokes his constitutional right to self-representation." *State v. Herrod*, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988) (citing *Faretta*, 422 U.S. at 836, 95 S. Ct. 2525. In *Faretta*, the Court said that "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation." 422 U.S. at 835, 95 S. Ct. 2525.

When a defendant asks to proceed *pro se*, the court must conduct an intensive inquiry as to his ability to represent himself. *See State v. Northington*, 667 S.W.2d 57, 61 (Tenn. 1984). To be valid, a defendant's waiver of his right to counsel "must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *Von Moltke v. Gillies*, 332 U.S. 708, 724, 68 S. Ct. 316, 92 L. Ed 309 (1948). "A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." *Id*.

Tennessee Rule of Criminal Procedure 44(b)(1) specifically provides:

> Before accepting a waiver of counsel, the court shall: (A) advise the accused in open court of the right to the aid of counsel at every stage of the proceedings; and (B) determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters.

- 18 -

Additionally, the waiver of counsel must be submitted in writing and made a part of the record. Tenn. R. Crim. P. 44(b)(2), (3).

In addition to affirmatively waiving the right to counsel, a defendant can implicitly waive or forfeit the right to counsel. *See State v. Carruthers*, 35 S.W.3d 516, 547 (Tenn. 2000); *see also State v. Holmes*, 302 S.W.3d 831, 840 (Tenn. 2010). Our supreme court has held that "an indigent criminal defendant may implicitly waive or forfeit the right to counsel by utilizing that right to manipulate, delay, or disrupt trial proceedings." *Carruthers*, 35 S.W.3d at 549. "[A]n implicit waiver may appropriately be found, where . . . the record reflects that the trial court advises the defendant the right to counsel will be lost if the misconduct persists and generally explains the risks associated with self-representation." *Id*. Thus, "compared to an affirmative waiver expressed through words, an implicit waiver is presumed from the defendant's conduct after he has been made aware that his continued misbehavior will result in the dangers and disadvantages of proceeding *pro se*." *Holmes*, 302 S.W.3d at 840.

The record shows that the trial court provided Defendant with a written colloquy, advising him of his right to counsel, and Defendant refused to sign the form. On April 9, 2015, one week before the start of Defendant's trial, the trial court held a hearing and provided Defendant with a form containing the required colloquy regarding self-representation. Defendant's counsel informed the court that Defendant "didn't look at it." The trial court asked Defendant, "[w]hy are you refusing to cooperate with [defense counsel]?" Defendant replied, "[b]ecause he told me off the rip [sic] he's not filing no motions on my behalf, and that's what ever[y] lawyer, how many lawyers, twelve lawyers, has told me the whole time." Defendant then told the trial court that he was going to represent himself. The trial court stated, "[w]ell, you need to fill out the form that was attempted to be presented to you by [defense counsel], then we'll get back to it after that." Defendant then requested copies "of every motion that's been filed on [his] behalf." The trial court responded, "[s]ure." After some discussion between the State and the trial court regarding redactions in Defendant's statement, Defendant told the trial court, "I don't want to sign anything." The trial court stated,

> Well, for the record, the Court will note that [Defendant] has had the benefit of I believe twelve different attorneys, maybe thirteen with [current defense counsel], and he's refused to basically cooperate with all of them, as they are continuing to have to file motions to withdraw because of conflict created by [Defendant].

Following the hearing, the trial court entered a written order stating that Defendant had been provided a "Colloquy for Waiver of Counsel packet that posed a lengthy series of questions to [Defendant] as a means of assuring that he is fully informed of the rights

he is foregoing and the risks associated with self-representation in a criminal case" and that Defendant had "refused to fill out or sign the colloquy under oath."

On the day of jury selection, the trial court revisited the issue. The following exchange occurred:

THE COURT: Let me get a few things out of the way.

[DEFENDANT]: Okay.

THE COURT: Also, I want to make sure that it is your personal decision this morning that you want to proceed to trial in representing yourself?

[DEFENDANT]: Yes, sir.

THE COURT: And I want to make sure that it's your personal decision and you want to proceed to trial representing yourself without the benefit of having elbow counsel there for legal advice, in the event that you want legal advice?

[DEFENDANT]: Yes, sir.

After the jury returned its verdict, the trial court asked Defendant if he wanted counsel appointed to represent him for sentencing. Defendant responded, "I just want to remain silent." The trial court stated, "[w]ell, since you have previously waived your attorney, I'm going to place the burden on you that if you want an attorney, you will have to be the one that requests it, otherwise, the waiver remains in effect, and you will continue to represent yourself pro se." At the conclusion of the sentencing hearing, the trial court again asked Defendant, "do you wish the Court to appoint you an attorney to represent you on your motion for new trial and/or your appeal?" Defendant replied, "[y]es."

As set out earlier in this opinion, Defendant was repeatedly afforded the opportunity to hire counsel or have one appointed to represent him. This is not a case of implicit waiver. There is nothing in the record to suggest that the trial court warned Defendant that his misbehavior could result in waiver of counsel. The trial court provided Defendant with a written waiver, and Defendant refused to sign the form. In *State v. Rashunus B. Pearsons*, a panel of this court held that the record did not establish that Defendant waived his right to counsel because the record did not contain a written waiver by Defendant as explicitly required by Tennessee Rule of Criminal Procedure

44(b)(2). No. 2017-01488-CCA-R3, 2018 WL 4026758, at *8 (Tenn. Crim. App. Aug. 22, 2018). In that case, however, the panel noted that in addition to the lack of a written waiver in the appellate record, there was no indication in the record that Defendant was offered a written waiver to sign or refused to sign a written waiver when offered. Here, Defendant was offered a written waiver and refused to sign. Defendant cannot benefit in this case from his refusal to sign the written waiver. The record is clear that he knowingly waived representation by counsel, that he refused the trial court's offer to have elbow counsel, and that he stubbornly refused to sign the waiver. Defendant got what he requested. He knew from prior experience that he could request counsel if he desired to do so, even after expressing a desire to proceed *pro se*.

We conclude that the trial court substantially complied with Rule 44. Despite Defendant's repeated requests to represent himself, the trial court offered the assistance of counsel to Defendant at every stage of the proceeding. Defendant is not entitled to relief on this issue.

*Consecutive sentencing*

Defendant contends that the trial court erred by ordering partial consecutive sentencing. Specifically, Defendant asserts that the trial court's imposition of consecutive sentences was improper because the trial court failed to make the requisite findings of fact under *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). It is well-settled law that such findings are required *only* when a trial court orders consecutive sentencing based on the "dangerous offender" statutory factor. The State responds that the trial court did not find Defendant to be a dangerous offender. We agree with the State.

When the record establishes that the sentence imposed by the trial court was within the appropriate range and reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The trial court must state on the record the factors it considered and the reasons for the sentence imposed. T.C.A. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing. *Id.* at 859. A trial court is permitted to impose consecutive sentences when it provides reasons on the record that establish one of the seven factors

enumerated in Tennessee Code Annotated section 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id*. at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id*. at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)).

Defendant is correct that when a trial court relies on Tennessee Code Annotated section 40-35-115(b)(4) to impose consecutive sentencing, "the record must also establish that the aggregate sentence reasonably relates to the severity of the offenses and that the total sentence is necessary for the protection of the public from further crimes by the defendant." *See Wilkerson*, 905 S.W.2d at 938. However, contrary to Defendant's assertion, the trial court did not rely on this factor to impose consecutive sentencing.

The record reflects that the trial court properly considered the purposes and principles of the Sentencing Act and stated its reasons for imposing consecutive sentencing on the record. At the conclusion of the sentencing hearing, the trial court found:

> There simply just isn't a lot of information for the Court to consider, other than the fact that [Defendant] does have an extensive criminal history and at least for the last twelve years, if not longer, at least the last twelve years, his primary source of income appears, from the record before this Court, to have been through drug activities, the sale of drugs, whether it be cocaine or marijuana, therefore the Court finds that the defendant is a professional criminal who has knowingly devoted much of his adult life to criminal acts as a major source of livelihood, and further that his record of criminal activity is extensive, even though he hasn't had any felony convictions in the twenty-first century, the terms of consecutive sentencing addresses criminal activity, not just criminal convictions. It appears, at least since 2002, he's been heavily involved in criminal activity of drug-dealing, based on the evidence that is before [the] Court, therefore the Court finds that there certainly is grounds for consecutive sentencing . . . .

The trial court applied two of the statutory factors in imposing partially consecutive sentences. The trial court found that the Defendant "is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood." T.C.A. § 40-35-115(b)(1). The trial court also found that Defendant "is an offender whose record of criminal activity is extensive." T.C.A. § 40-

35-115(b)(2).  The evidence does not preponderate against the trial court's findings.  We conclude that the trial court did not abuse its discretion by imposing partial consecutive sentencing.  Defendant is not entitled to relief on this issue.

*Excessive fines*

Defendant also contends that the fines imposed by the trial court are excessive.  The jury imposed an aggregate fine of $125,000.  In denying Defendant's motion for new trial, the court held that "based on the factors already addressed at the sentencing [hearing] and weighing those factors against Defendant's future ability to pay, the court finds that fines are necessary because of the nature of the offenses (illegal conduct for financial gain in lieu of lawful employment), and future deterrence because of the Defendant's lengthy criminal history."  The trial court reduced the fines to $40,000.

The United States Constitution and the Tennessee Constitution prohibit excessive fines.  U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); Tenn. Const. art. I, § 16 ("That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").  Moreover, any fine over $50 must be assessed by a jury.  Tenn. Const. art. VI, § 14 ("No fine shall be laid on any citizen of this State that shall exceed fifty dollars, unless it shall be assessed by a jury of his peers, who shall assess the fine at the time they find the fact, if they think the fine should be more than fifty dollars.").

The imposition of fines is viewed as a portion of a defendant's sentence, and the standard of review is abuse of discretion.  *See State v. Bryant*, 805 S.W.2d 762, 727 (Tenn. 1991); *see also Bise*, 380 S.W.3d at 707; *State v. Anthony Xen Maples*, No. E2013-00961-CCA-R3-CD, 2014 WL 1056671, at *5 (Tenn. Crim. App. Mar. 18, 2014), *no perm. app. filed*.  The amount of any fine should be based upon the principles of sentencing, including "prior offenses, potential for rehabilitation, mitigating and aggravating circumstances, and other matters relevant to an appropriate sentence." *Bryant*, 805 S.W.2d at 765-66.  "A defendant's ability to pay is a factor in the establishment of fines."  *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); *see* T.C.A. § 40-35-207(a)(7) (2014) (requiring upon the trial court's request that the presentence report include information to "assist the court in imposing a fine").  "[A]lthough the defendant's ability to pay a fine is a factor, it is not necessarily a controlling one."  *State v. Marshall*, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993).  Furthermore, "a significant fine is not automatically precluded just because it works a substantial hardship on a defendant – it may be punitive in the same fashion incarceration may be punitive."  *Id*.

- 23 -

The presentence report reflects that Defendant refused to cooperate or provide any information for the presentence report.  Consequently, the report contains no information regarding Defendant's ability to pay.  The record reflects that the trial court considered Defendant's extensive criminal history and his low potential for rehabilitation.  Under these circumstances, we conclude that the trial court did not abuse its discretion by imposing an aggregate fine of $40,000.  Defendant is not entitled to relief on this issue.

CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE